267 So.2d 352 (1972)
STATE of Florida, Appellant,
v.
Danny Ray MILLER et al., Appellees.
No. 71-991.
District Court of Appeal of Florida, Fourth District.
September 26, 1972.
Rehearing Denied November 3, 1972.
*353 Rom W. Powell, County Sol. and John H. King, Asst. County Sol., Orange County, Orlando, for appellant.
James C. Dauksch, Jr., Orlando, for appellee, Robert E. Collier.
Warren H. Horton, Asst. Pub. Defender, Orlando, for appellee, Jack P. Moorehead.
Peter M. De Manio, Orlando, for appellee, Danny Ray Miller.
MAGER, Judge.
It is our opinion that under the circumstances of this case there was probable cause to stop, detain, search and arrest; the evidence thus obtained was legally obtained and should not have been suppressed.
In a well reasoned opinion involving the search of automobiles, Judge Mann very aptly observed:
"The Constitution forbids unreasonable searches and seizures. It forbids harrassment and prejudicial enforcement of the law. But the Constitution does not forbid the application of common sense in the detection of crime and the apprehension of criminals." State v. Holmes, Fla.App. 1971, 256 So.2d 32, 37.
It is very often the case that the search of a motor vehicle is made without a warrant. These situations are created by the high degree of mobility of the automobile which makes it impractical to secure a search warrant; to require a warrant under such circumstances might prevent the apprehension of persons carrying illegally obtained goods. Collins v. State, Fla. 1953, 65 So.2d 61.
A search without a warrant is, nonetheless, valid in certain instances. In Church v. State, Fla.App. 1970, 244 So.2d 506, at p. 508, it was held:
"The search of the automobile may be justified either because of the existence of probable cause or as an incident to the lawful arrest. The search of a moving vehicle, or one capable of being instantly put into motion, is on a different legal plane than the search of a place such as an office or a shop or a store or even a home. Ever since the Carroll case in 1925, decided by the United States Supreme Court (Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543), the legal distinction between search of a moving automobile and other species of searches has been clearly demarcated." (Emphasis added.)
This distinction is further illustrated in Cameron v. State, Fla.App. 1959, 112 So.2d 864, at 873:
"As a necessary and proper evolution of the living law to meet the changing needs of society, the modern trend of authority is to narrow the concept of immunity against searches and seizures when it involves a motor vehicle used as an aid to the commission of crimes, whether in transporting the criminal or the fruit of the crime. This trend is reflected by the acceptance of less compelling facts and circumstances than formerly required to constitute `probable cause' for an arrest of the driver or occupant, or for search of the vehicle and seizure of property found therein without supporting warrants."
In Draper v. United States, 1959, 358 U.S. 307, at page 313, 79 S.Ct. 329, at page 333, 3 L.Ed.2d 327, the Supreme Court of the United States in discussing "probable cause" commented:
"In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical, they are the factual and practical *354 considerations of everyday life on which reasonable and prudent men, not legal technicians, act."
A review of the facts leads us to the conclusion that in the case sub judice the search was based upon sufficient probable cause. The record reflects that on the night in question, at approximately 9:30 P.M., two Florida highway patrolmen were parked in their patrol cars near an intersection in a business district. The troopers were engaged in conversation when they observed a red truck pass in front of their patrol cars. One of the troopers remarked that the vehicle looked very similar to a local fire rescue truck. As they continued their conversation the same vehicle again passed in front of them going in the opposite direction. The troopers continued their conversation for another 20 or 30 minutes. Then, one of the troopers noticed the truck entering a nearby construction site where a motel was then under construction. The vehicle was observed disappearing behind the motel; it reappeared approximately 2 or 3 minutes later within the construction area. The truck then left the site and entered one of the main thoroughfares.
The officers followed the truck and signaled it to pull over to the side of the highway. The truck was stopped within a quarter of a mile of the construction area. The truck had a Missouri tag and was occupied by the defendants. One of the troopers looked into the right door of the truck to the rear and saw a large mass of carpet in the rear of the truck. Upon inquiry the defendants stated that the carpet belonged to them and that they had brought it from home. The defendants indicated that the reason for being in the area was that they were "just riding around". While one trooper detained the occupants of the truck the other trooper opened the rear door of the truck to determine the color of the carpet and then proceeded to the motel area to see if any carpet was missing. It was discovered that carpet of the same color was missing from one of the rooms at the motel and upon his return the trooper advised the three men that they were under arrest. Defendants were later charged with breaking and entering with intent to commit a felony and grand larceny, the carpet in the truck being evidence of the grand larceny.
Defendants moved to suppress the evidence in question on the grounds that probable cause did not exist for the search of the truck and that the evidence was illegally seized without a warrant. The trial court granted defendants' motion to suppress from which order the state has appealed.
Applying the principles hereinabove set forth to the foregoing facts, it is our opinion that the "search" of the truck was justified on the basis of the existence of probable cause; additionally, the search was justified on the basis of being "incident to a lawful detention". It is questionable whether there was, in fact or in law, the type of "search" that would bring into play those principles customarily applicable to search and seizure situations. No "search" was necessary to determine the presence of the carpet in the truck as it was in the plain view of the investigating officer. In State v. Ashby, Fla. 1971, 245 So.2d 225, the Supreme Court of Florida held, at pp. 227, 228:
"It is not a search to observe, and to seize, what is so placed where it may be seen by an officer who is where he has a legal right to be. State v. Parnell, supra, [Fla., 221 So.2d 129]; Victor v. State, 141 Fla. 508, 193 So. 762 (1940); Blake v. State, 112 So.2d 391 (Fla.App.3rd, 1959). In application of the `open view' doctrine, it is not an unreasonable search without warrant for an officer to move to a position where he has a legal right to be, and look for things he may have reason to believe will be seen."
Similarly, in Donar v. State, Fla.App. 1970, 236 So.2d 145, 146, it was observed:
"... It is elementary that every search without a warrant, if seeing what *355 is obvious by the beams of a flashlight can be termed a search, is not an unlawful or unreasonable search condemned by provisions of the State and Federal Constitutions... ."
See also Gaskins v. State, Fla. 1956, 89 So.2d 867; State v. Smith, Fla.App. 1966, 193 So.2d 23; Moore v. Wainwright, Fla.App. 1971, 248 So.2d 262; State v. O'Steen, Fla.App. 1970, 238 So.2d 434; and Boim v. State, Fla.App. 1967, 194 So.2d 313.
The fact that the trooper opened the rear door of the truck to ascertain the color of the carpet after initially observing the presence of the carpet does not, in our opinion, invalidate the "search". The entry into the truck was not made to determine what, if anything, the truck contained in the hope of finding something incriminating; instead, after having observed the presence of a large mass of carpet in the rear of the truck, the trooper opened the rear door of the truck to ascertain the color of the carpet. Thereafter the officer went to check the rooms at the motel under construction and found that the carpet missing from one of the motel rooms was the same color as the carpet in the back of the truck. Conceivably the trooper, after having observed the carpet in the rear of the truck, could then have proceeded to the motel room, ascertained the color of the carpet that was missing, returned to the truck and then opened the rear door of the truck to verify the color of the carpet therein; or, upon returning from the motel, placed the defendants under arrest and proceeded thereafter to conduct a search of the truck to ascertain the color of the carpet. The fact that this latter procedure was not followed does not vitiate the search.
It is, however, somewhat difficult to separate the determination of the existence of "probable cause" from the determination of the lawfulness of the detention. In our view the determination of the probable cause for the search or the reasonableness of such search may well turn on the lawfulness of the detention. It is without dispute that there was no arrest prior to the "search" so that it cannot be said that the "search" was an incident to a lawful arrest. However, it would seem that the search should nevertheless be justified as having been made "incident to a lawful detention". A search, which in this case, was incident to a lawful detention is as justifiable as a search incident to a lawful arrest. Standing by itself, a warrantless search must be founded on probable cause. The probable cause requirement is either "satisfied" or obviated when the warrantless search is incident to a lawful arrest. Here, too, the probable cause requirement is seemingly satisfied when the search in question was made incident to a lawful detention. The distinction between a lawful detention and a lawful arrest insofar as the validity of a search is concerned is a gossamer one at best; in both instances the liberty of the individual is restrained. If the arrest is "lawful" (as that word has been interpreted by case law), then a search incident thereto has been upheld. Analogously, if the facts and circumstances demonstrate that a detention is "lawful" then a search incident thereto should likewise be valid.
The Florida courts have recognized the validity of the use of detentions which fall short of technical arrest. State v. Ebert, Fla.App. 1971, 251 So.2d 38, citing Gustafson v. State, Fla.App. 1971, 243 So.2d 615, quashed in part State v. Gustafson, Fla., 258 So.2d 1, opinion filed January 26, 1972. The validity of such detention is dependent upon the reasonableness, the test of which Gustafson stated to be as follows:
"`But due regard for the practical necessities of the effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers would have had reasonable grounds for their actions. A founded suspicion [supplied] is all that is necessary, some basis from which the court can determine that *356 the detention was not arbitrary or harassing.' Wilson v. Porter, supra [9 Cir., 361 F.2d 412]."
Considering the hour of day; the fact that the truck (which was unmarked) had made several passes in a business district; was seen entering into and departing from a motel under construction; created more than a bare suspicion and justified further investigation and detention. Goss v. State, Alaska 1964, 390 P.2d 220. Moreover, the detention of the defendants was, in our opinion, lawful and justified under the provisions of F.S. Section 901.151, F.S.A., commonly known as the "stop and frisk law". The language of the stop and frisk law permits a law enforcement officer to temporarily detain any person whom the law enforcement officer encounters, "under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state;" the purpose of such detention to "ascertain the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense". The facts of this case support an application of Section 901.151.
The troopers, as the state suggests, could have made an arrest of the defendants based upon the fact that they were operating a vehicle with an out-of-state license and then proceeded to make a search as an incident to such arrest. It would, however, seem that this procedure would serve only to encourage an arrest as a pretext for a search for evidence resulting in a situation where the court's attention is directed to the motive of the arresting officer instead of the conduct of the accused. See State v. Holmes, supra; see also Gagnon v. State, Fla.App. 1968, 212 So.2d 337. Moreover, surely the law should not be interpreted in such a manner as to encourage law enforcement to indulge in a subterfuge in order to effectuate a lawful search. Under the circumstances of this case, it is difficult to visualize a more reasonable course of conduct than that followed by the officers in question; hindsight may suggest a different technique but what might be a more technically correct procedure should not result in the exclusion of evidence. As was observed in Thomas v. State, Fla.App. 1971, 250 So.2d 15, at 17:
"`... [I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts. * * *'"
In summary, it is our opinion that the evidence in question was properly obtained on the basis that (1) there was no "search" within the meaning of the open view doctrine, (2) if there was a search probable cause existed for such search, and (3) the search was made as an incident to a lawful detention.
In reaching this conclusion we are not unmindful of the constitutional guarantee of the right of the people to be secure from unreasonable searches and seizures. With equal, if not paramount, awareness we cannot be unmindful that the life, liberty and property of the people should be secure from potential lawbreakers. If any of these objectives are to be achieved the crime prevention, crime detection and criminal apprehension processes must not be diluted by artificial safeguards. Common sense and reason should be the polar stars in measuring the affected rights and applicable safeguards.
Accordingly, the orders suppressing the evidence are reversed and the cause remanded with directions to take such further proceedings not inconsistent herewith.
WHITE, JOS. S., Associate Judge, concurs.
*357 WALDEN, J., dissents, with opinion.
WALDEN, Judge (dissenting):
I respectfully dissent. The constitutional rights of these defendants were infringed as a result of an illegal search and seizure. This was correctly recognized by the trial judge when he entered the orders here appealed which suppressed the tainted fruits. I would affirm upon authority of Kraemer v. State, Fla. 1952, 60 So.2d 615; Moore v. State, Fla.App. 1965, 181 So.2d 164; and Staples v. United States, 5 Cir.1963, 320 F.2d 817.
I think it clear  using the majority statement of the facts  that there was no probable cause to search. See Beck v. State, Fla.App. 1966, 181 So.2d 659; Paula v. State, Fla.App. 1966, 188 So.2d 388; State v. Jones, Fla.App. 1969, 222 So.2d 216; and Edmond v. State, Fla.App. 1968, 208 So.2d 135; State v. Sanders, Fla.App. 1970, 239 So.2d 120 and Crosby v. United States, 5 Cir.1956, 231 F.2d 679.
In my judgment the newly coined "search incident to a lawful detention" finds no support in the law and espouses a dangerous and unconstitutional notion which, if allowed to stand, will be oppressive to the rights of citizens to be free from unreasonable searches and seizures. It is bootstrapping in its worst sense. An officer sees someone "suspicious" (suspicion, like beauty, is in the eyes of the beholder and certainly an officer could see something suspicious about anyone he wishes to intercept). He detains such person (I think it's an illegal arrest where, as here, there are no circumstances that reasonably indicate the commission of a crime). He searches such person's vehicle (not for a weapon and neither is there contraband in sight). He conducts an investigation at another locale, based on the search findings. He then discovers grounds to believe a crime has been committed. Based on the after acquired knowledge  the fruit of an illegal search and seizure  he then arrests the persons. The palpable constitutional improprieties and opportunities for abuse are manifest.
As to the argumentative affirmation that the troopers did not search the vehicle, the record speaks as follows:
TESTIMONY OF E.F. KNUCK:
"Q Did you and Trooper Boyette stop a van around ten o'clock that night for any reason?
"A Yes, we did.
"Q Did you upon first approaching the van look in or climb inside?
"A No, sir.
"Q Did you ever at any time open the doors of the van?
"A The rear doors, yes; the right front door was already open.
"Q When was it opened?
"A When all the passengers in the vehicle had come out of the vehicle.
* * * * * *
"Q When you came back, is that when you placed them under arrest?
"A Yes.
"Q And was it before you arrested them or after you arrested them that you opened the back door?
"A Before the arrest, before I went to the motel.
"Q You looked into the truck before you went to the motel?
"A Yes.
"Q But you opened the door to look into the vehicle?
"A I was standing 
"Q (Interposing). When you opened the back door, was that before or after the arrest?
"A Before the arrest.

*358 "Q Okay. You have mentioned that when you and Officer Boyette detained them, by stopping them and and (sic) having them get out of the vehicle, so you detained them and then you arrested them, was that later after you came back from the motel?
"A Yes. I asked Trooper Boyette to stay there with them while I went back and checked.
"Q When you opened the door and looked into the vehicle, was that after you had come back from the motel?
"A No, it was before.
"Q Why did you open the doors?
"A When I first approached the vehicle the rear doors were closed. I went to the right front door which was open and the first thing I noticed was a knife and a sheath, which is the secondary thing because it is something you might see in any vehicle, and the second thing I noticed was a wallet.
"Q What else did you see?
"A The third thing was obvious and could not have been hidden there unless it was under a tarp and was a large mass of carpeting lying in the back of the panel truck. I was standing in the right door and I could see from the dash board back.
"Q Why did you open the back door if you could see from the front?
"A To definitely check with the headlights. The color under a flashlight would be hard to see, other than it was a pile of carpeting.
"Q I see, you were using the headlights from the car which was parked behind the truck?
"A Yes."
The majority opinion possibly relies upon the stop and frisk law, F.S. § 901.151, F.S.A., Laws of 1969. It provides:
"901.151 Stop and frisk law. 
* * * * * *
"(2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
"(3) No person shall be temporarily detained under the provisions of subsection (2) of this section longer than is reasonably necessary to effect the purposes of that subsection. Such temporary detention shall not extend beyond the place where it was first effected or the immediate vicinity thereof.
* * * * * *
"(5) Whenever any law enforcement officer authorized to detain temporarily any person under the provisions of subsection (2) of this section has probable cause to believe that any person whom he has temporarily detained, or is about to detain temporarily, is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person, he may search such person so temporarily detained only to the extent necessary to disclose, and for the purpose of disclosing, the presence of such weapon. If such a search discloses such a weapon or any evidence of a criminal offense it may be seized.
"(6) No evidence seized by a law enforcement officer in any search under this section shall be admissible against *359 any person in any court of this state or political subdivision thereof unless the search which disclosed its existence was authorized by and conducted in compliance with the provisions of subsections (2)-(5)." (Emphasis supplied.)
Several things are to be noted. In my opinion, although possible suspicion existed, the threshold requirements as to a reasonable indication of the commission of a crime were not met. More importantly, even a person properly stopped can only be searched or frisked for a dangerous weapon when the officer has probable cause to believe that the person is armed and offers a threat to the safety of the officer. Here there is no suggestion that the defendants were searched for a weapon, and neither was such found. Finally, it is clear that the search in question and the seizure was not authorized or conducted in compliance with the stop and frisk law and, hence, was properly suppressed.
The Supreme Court of the United States first recognized with approval the stop and frisk concept in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Their latest expression, which expression, I believe, is dispositive of the instant appeal, is found in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). There the sequence was as follows: the suspect was stopped, based on advice from an informer. The investigating officer reached into the vehicle and removed a loaded revolver from the suspect's waistband. While not visible to the officer, it was in precisely the place indicated by the informant. The suspect was at that point arrested by the officer for possession of the pistol. A search incident to that arrest was conducted which produced heroin and other weapons. The majority of the Supreme Court of the United States determined that appropriate circumstances, based upon the information furnished by the informant, existed for the officer to stop and investigate the suspect, even though there was no probable cause to make the arrest. Here, we come to the critical difference in the sequence of events. The officer in the Adams case frisked the suspect for a weapon based on probable cause and found a weapon, the possession of which violated the law. The suspect was arrested and the suspect was after arrest searched for items other than weapons. In the instant case, the suspect was stopped upon questionable grounds. He was not frisked for a weapon and he was searched before being arrested. Clearly this conduct and sequence finds no comfort or support in the stop and frisk law, or otherwise, and I am strongly persuaded that the search and seizure here reflected cannot be legally sanctioned.
Any way it is sliced, the majority has simply engrafted an impermissible and inappropriate amendment to the stop and frisk law. They would allow a citizen to be stopped (not arrested) and searched for anything (not limited to weapons). This is the meaning of a "search incident to a lawful detention".
If there is a law and order overtone to be gleaned with the result that somehow the ends here justify the means, I can only remind that if martial law were imposed and all constitutional rights suspended, the police, without bridle, could search and seize at will and undoubtedly prevent and solve a lot of crimes.
For these reasons I would affirm the trial court decision.